(Slip Opinion)    OCTOBER TERM, 2013    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LOUGHRIN *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 13–316.   Argued April 1, 2014—Decided June 23, 2014

A part of the federal bank fraud statute, 18 U. S. C. §1344(2), makes it a crime to "knowingly execut[e] a scheme . . . to obtain" property owned by, or under the custody of, a bank "by means of false or fraudulent pretenses." Petitioner Kevin Loughrin was charged with bank fraud after he was caught forging stolen checks, using them to buy goods at a Target store, and then returning the goods for cash. The District Court declined to give Loughrin's proposed jury instruction that a conviction under §1344(2) required proof of "intent to defraud a financial institution." The jury convicted Loughrin, and the Tenth Circuit affirmed.

*Held*: Section 1344(2) does not require the Government to prove that a defendant intended to defraud a financial institution. Pp. 4–15.

   (a) Section 1344(2) requires only that the defendant intend to obtain bank property and that this end is accomplished "by means of" a false statement. No additional requirement of intent to defraud a bank appears in the statute's text. And imposing that requirement would prevent §1344(2) from applying to cases falling within the statute's clear terms, such as frauds directed against a third-party custodian of bank-owned property. Loughrin's construction would also make §1344(2) a mere subset of §1344(1), which prohibits any scheme "to defraud a financial institution." That view is untenable because those clauses are separated by the disjunctive "or," signaling that each is intended to have separate meaning. And to read clause (1) as fully encompassing clause (2) contravenes two related interpretive canons: that different language signals different meaning, and that no part of a statute should be superfluous. Pp. 4–6.

   (b) Loughrin claims that his view is supported by similar language in the federal mail fraud statute and by federalism principles, but his

arguments are unpersuasive.  Pp. 7–15.

(1) In *McNally* v. *United States*, 483 U. S. 350, this Court interpreted similar language in the mail fraud statute, §1341—which served as a model for §1344—to set forth just one offense, despite the use of the word "or."  But the two statutes have notable textual differences.  The mail fraud law contains two phrases strung together in a single, unbroken sentence, whereas §1344's two clauses have separate numbering, line breaks, and equivalent indentation—all indications of separate meaning.  Moreover, Congress likely did not intend to adopt *McNally*'s interpretation when it enacted §1344, because at that time (three years before *McNally*) every Court of Appeals had interpreted the word "or" in the mail fraud statute in its usual, disjunctive sense.  And while *McNally* found that unique features of the mail fraud statute's history supported its view, the legislative history surrounding the adoption of §1344 points the other way.  Pp. 7–9.

(2) Loughrin also contends that without an element of intent to defraud a bank, §1344(2) would apply to every minor fraud in which the victim happens to pay by check.  This, he says, would unduly expand the reach of federal criminal law into an area traditionally left to the States.  But this argument ignores a significant textual limit on §1344(2)'s reach: The criminal must acquire (or attempt to acquire) the bank property "*by means of*" the misrepresentation.  That language limits §1344(2)'s application to cases (like this one) in which the misrepresentation has some real connection to a federally insured bank, and thus to the pertinent federal interest.  Pp. 9–15.

710 F. 3d 1111, affirmed.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined, and in which SCALIA and THOMAS, JJ., joined as to Parts I and II, Part III–A except the last paragraph, and the last footnote of Part III–B. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which THOMAS, J., joined.  ALITO, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 13–316

————

## KEVIN LOUGHRIN, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 23, 2014]

JUSTICE KAGAN delivered the opinion of the Court.

A provision of the federal bank fraud statute, 18 U. S. C. §1344(2), makes criminal a knowing scheme to obtain property owned by, or in the custody of, a bank "by means of false or fraudulent pretenses, representations, or promises." The question presented is whether the Government must prove that a defendant charged with violating that provision intended to defraud a bank. We hold that the Government need not make that showing.

I

Petitioner Kevin Loughrin executed a scheme to convert altered or forged checks into cash. Pretending to be a Mormon missionary going door-to-door in a neighborhood in Salt Lake City, he rifled through residential mailboxes and stole any checks he found. Sometimes, he washed, bleached, ironed, and dried the checks to remove the existing writing, and then filled them out as he wanted; other times, he did nothing more than cross out the name of the original payee and add another. And when he was lucky enough to stumble upon a blank check, he completed it and forged the accountholder's signature. Over several months, Loughrin made out six of these checks to the

retailer Target, for amounts of up to $250. His *modus operandi* was to go to a local store and, posing as the accountholder, present an altered check to a cashier to purchase merchandise. After the cashier accepted the check (which, remarkably enough, happened time after time), Loughrin would leave the store, then turn around and walk back inside to return the goods for cash.

Each of the six checks that Loughrin presented to Target was drawn on an account at a federally insured bank, including Bank of America and Wells Fargo. Employees in Target's back office identified three of the checks as fraudulent, and so declined to submit them for payment. Target deposited the other three checks. The bank refused payment on one, after the accountholder notified the bank that she had seen a man steal her mail. Target appears to have received payment for the other two checks, though the record does not conclusively establish that fact. See Brief for United States 6, 7, n. 3.

The Federal Government eventually caught up with Loughrin and charged him with six counts of committing bank fraud—one for each of the altered checks presented to Target. The federal bank fraud statute, 18 U. S. C. §1344, provides as follows:

> "Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>     (1) to defraud a financial institution; or
>     (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."[1]

---

[1] A "financial institution," as defined in 18 U. S. C. §20, includes a

Ruling (for a reason not material here) that Circuit precedent precluded convicting Loughrin under the statute's first clause, §1344(1), the District Court allowed the case to go to the jury on the statute's second, §1344(2).

The court instructed the jury that it could convict Loughrin under that clause if, in offering the fraudulent checks to Target, he had "knowingly executed or attempted to execute a scheme or artifice to obtain money or property from the [banks on which the checks were drawn] by means of false or fraudulent pretenses, representations, or promises." App. 7. Loughrin asked as well for another instruction: The jury, he argued, must also find that he acted with "intent to defraud a financial institution." App. to Pet. for Cert. 43a. The court, however, declined to give that charge, and the jury convicted Loughrin on all six counts.

The United States Court of Appeals for the Tenth Circuit affirmed. See 710 F. 3d 1111 (2013). As relevant here, it rejected Loughrin's argument that "a conviction under §1344(2) requires proof that he intended to defraud the banks on which the [altered] checks had been drawn." *Id.,* at 1115. That intent, the court reasoned, is necessary only under the bank fraud law's first clause. The court acknowledged that under its interpretation, §1344(2) "cast[s] a wide net for bank fraud liability," but concluded that such a result is "dictated by the plain language of the statute." *Id.,* at 1117.

We granted certiorari, 571 U. S. \_\_\_ (2013), to resolve a Circuit split on whether §1344(2) requires the Government to show that a defendant intended to defraud a federally insured bank or other financial institution.[2] We now

_____

federally insured bank of the kind involved here.

[2] Compare 710 F. 3d 1111, 1116 (CA10 2013) (case below) (§1344(2) does not require intent to defraud a bank); *United States* v. *Everett*, 270 F. 3d 986, 991 (CA6 2001) (same), with *United States* v. *Thomas*, 315 F. 3d 190, 197 (CA3 2002) (§1344(2) requires such intent); *United*

affirm the Tenth Circuit's decision.

## II

We begin with common ground. All parties agree, as do we and the Courts of Appeals, that §1344(2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" with at least two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." (We refer to that element, more briefly, as intent "to obtain bank property.") Brief for United States 11, 17, 20, 22, 32; Brief for Petitioner 30–31. And second, the clause requires that the envisioned result—*i.e.*, the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises." See Brief for United States 21–22; Reply Brief 18–19. Loughrin does not contest the jury instructions on either of those two elements. Nor does he properly challenge the sufficiency of the evidence supporting them here.[3]

The single question presented is whether the Government must prove yet another element: that the defendant

---

*States* v. *Kenrick*, 221 F. 3d 19, 29 (CA1 2000) (same); *United States* v. *Jacobs*, 117 F. 3d 82, 92–93 (CA2 1997) (same).

[3] Loughrin argued to the jury that the evidence failed to show that he intended to obtain bank property: He claimed that once he "obtained cash from Target, . . . he was indifferent to whether Target ever submitted the check to a bank or whether a bank ever made payment on it." Brief for Petitioner 32; see Tr. 233–235; App. to Pet. for Cert. 46a. The jury rejected that contention, as did the District Court on a motion for judgment of acquittal. See Record 168. In his appeal, Loughrin waived the argument by conceding that if the District Court correctly instructed the jury on §1344(2)'s elements, "then there was sufficient evidence to convict." Appellant's Opening Brief in No. 11–4158 (CA10), p. 34. And although Loughrin's briefs to this Court attempt to cast doubt on the jury's finding that he intended to obtain bank property, see Brief for Petitioner 30–32, that issue is not "fairly included" in the question his certiorari petition presented, Sup. Ct. R. 14.1(a).

intended to defraud a bank. As Loughrin describes it, that element would compel the Government to show not just that a defendant intended to obtain bank property (as the jury here found), but also that he specifically intended to deceive a bank. See Reply Brief 17. And that difference, Loughrin claims, would have mattered in this case, because his intent to deceive ran only to Target, and not to any of the banks on which his altered checks were drawn.

But the text of §1344(2) precludes Loughrin's argument. That clause focuses, first, on the scheme's goal (obtaining bank property) and, second, on the scheme's means (a false representation). We will later address how the "means" component of §1344(2) imposes certain inherent limits on its reach. See *infra,* at 11–14. But nothing in the clause additionally demands that a defendant have a specific intent to deceive a bank. And indeed, imposing that requirement would prevent §1344(2) from applying to a host of cases falling within its clear terms. In particular, the clause covers property "owned by" the bank but in someone else's custody and control (say, a home that the bank entrusted to a real estate company after foreclosure); thus, a person violates §1344(2)'s plain text by deceiving a non-bank custodian into giving up bank property that it holds. Yet under Loughrin's view, the clause would not apply to such a case except in the (presumably rare) circumstance in which the fraudster's intent to deceive extended beyond the custodian to the bank itself. His proposed inquiry would thus function as an extra-textual limit on the clause's compass.

And Loughrin's construction of §1344(2) becomes yet more untenable in light of the rest of the bank fraud statute. That is because the *first* clause of §1344, as all agree, includes the requirement that a defendant intend to "defraud a financial institution"; indeed, that is §1344(1)'s whole sum and substance. See Brief for United States 18; Brief for Petitioner 8. To read the next clause, following

the word "or," as somehow repeating that requirement,
even while using different words, is to disregard what "or"
customarily means. As we have recognized, that term's
"ordinary use is almost always disjunctive, that is, the
words it connects are to be given separate meanings."
*United States* v. *Woods*, 571 U. S. ___, ___ (2013) (slip op.,
at 14). Yet Loughrin would have us construe the two
entirely distinct statutory phrases that the word "or" joins
as containing an identical element. And in doing so, his
interpretation would make §1344's second clause a mere
subset of its first: If, that is, §1344(2) implicitly required
intent to defraud a bank, it would apply only to conduct
already falling within §1344(1). Loughrin's construction
thus effectively reads "or" to mean "including"—a defini-
tion foreign to any dictionary we know of.

As that account suggests, Loughrin's view collides as
well with more general canons of statutory interpretation.
We have often noted that when "Congress includes partic-
ular language in one section of a statute but omits it in
another"—let alone in the very next provision—this Court
"presume[s]" that Congress intended a difference in mean-
ing. *Russello* v. *United States*, 464 U. S. 16, 23 (1983)
(citation omitted). And here, as just stated, overriding
that presumption would render §1344's second clause
superfluous. Loughrin's view thus runs afoul of the "car-
dinal principle" of interpretation that courts "must give
effect, if possible, to every clause and word of a statute."
*Williams* v. *Taylor*, 529 U. S. 362, 404 (2000) (citation
omitted).[4]

---

[4] Loughrin responds that our interpretation of the statute creates a
converse problem of superfluity: Clause (2), he says, would emerge so
broad as to wholly swallow Clause (1). See Reply Brief 7. But that is
not right. The Courts of Appeals, for example, have unanimously
agreed that the Government can prosecute check kiting (*i.e.*, writing
checks against an account with insufficient funds in a way designed to
keep them from bouncing) only under Clause (1), because such schemes

### III

Loughrin makes two principal arguments to avoid the import of the statute's plain text. First, he relies on this Court's construction of comparable language in the federal mail fraud statute to assert that Congress intended §1344(2) merely to explicate the scope of §1344(1)'s prohibition on scheming to defraud a bank, rather than to cover any additional conduct. And second, he contends that unless we read the second clause in that duplicative way, its coverage would extend to a vast range of fraudulent schemes, thus intruding on the historic criminal jurisdiction of the States. Neither argument is without force, but in the end, neither carries the day.

### A

"[D]espite appearances," Loughrin avers, §1344(2) has no independent meaning: It merely specifies part of what §1344(1) already encompasses. Brief for Petitioner 8. To support that concededly counterintuitive argument, Loughrin invokes our decision in *McNally* v. *United States*, 483 U. S. 350 (1987), interpreting similar language in the mail fraud statute, 18 U. S. C. §1341. That law, which served as a model for §1344, see *Neder* v. *United States*, 527 U. S. 1, 20–21 (1999), prohibits using the mail to further "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." Loughrin rightly explains that, despite the word "or," *McNally* understood that provision as setting forth just one offense—using the mails to advance a scheme to defraud. The provision's

––––––––––

do not involve any false representations. See Tr. of Oral Arg. 46–47; see, *e.g., United States* v. *Doherty*, 969 F. 2d 425, 427–428 (CA7 1992) (citing *Williams* v. *United States*, 458 U. S. 279, 284–285 (1982)). No doubt, the overlap between the two clauses is substantial on our reading, but that is not uncommon in criminal statutes. See, *e.g., Hubbard* v. *United States*, 514 U. S. 695, 714, n. 14 (1995).

back half, we held, merely codified a prior judicial decision applying the front half: In other words, the back clarified that the front included certain conduct, rather than doing independent work. 483 U. S., at 358–359. According to Loughrin, we should read the bank fraud statute in the same way.

But the two statutes, as an initial matter, have notable textual differences. The mail fraud law contains two phrases strung together in a single, unbroken sentence. By contrast, §1344's two clauses have separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings. The legislative structure thus reinforces the usual (even if not *McNally*'s) understanding of the word "or" as meaning . . . well, "or"—rather than, as Loughrin would have it, "including."

Moreover, Loughrin's reliance on *McNally* encounters a serious chronological problem. Congress passed the bank fraud statute in 1984, three years *before* we decided that case. And at that time, every Court of Appeals to have addressed the issue had concluded that the two relevant phrases of the mail fraud law must be read "in the disjunctive" and "construed independently." 483 U. S., at 358 (citing, *e.g.*, *United States* v. *Clapps*, 732 F. 2d 1148, 1152 (CA3 1984); *United States* v. *States*, 488 F. 2d 761, 764 (CA8 1973)). *McNally* disagreed, eschewing the most natural reading of the text in favor of evidence it found in the drafting history of the statute's money-or-property clause. But the Congress that passed the bank fraud statute could hardly have predicted that *McNally* would overturn the lower courts' uniform reading. We thus see no reason to doubt that in enacting §1344, Congress said what it meant and meant what it said, see *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 254 (1992)—*i.e.,* that it both said "or" and meant "or" in the usual sense.

And a peek at history, of the kind *McNally* found decisive, only cuts against Loughrin's reading of the bank fraud statute. According to *McNally*, Congress added the mail fraud statute's second, money-or-property clause merely to affirm a decision of ours interpreting the ban on schemes "to defraud": The second clause, *McNally* reasoned, thus worked no substantive change in the law. See 483 U. S., at 356–359 (discussing Congress's codification of *Durland* v. *United States*, 161 U. S. 306 (1896)). By contrast, Congress passed the bank fraud statute to *disapprove* prior judicial rulings and thereby expand federal criminal law's scope—and indeed, partly to cover cases like Loughrin's. One of the decisions prompting enactment of the bank fraud law, *United States* v. *Maze*, 414 U. S. 395 (1974), involved a defendant who used a stolen credit card to obtain food and lodging. (Substitute a check for a credit card and Maze becomes Loughrin.) The Government brought charges of mail fraud, relying on postpurchase mailings between the merchants and issuing bank to satisfy the statute's mailing element. But the Court held those mailings insufficiently integral to the fraudulent scheme to support the conviction. See *id.,* at 402. Hence, *Maze* created a "serious gap[ ] . . . in Federal jurisdiction over frauds against banks." S. Rep. No. 98–225, p. 377 (1983). Congress passed §1344 to fill that gap, enabling the Federal Government to prosecute fraudsters like Maze and Loughrin. We will not deprive that enactment of its full effect because *McNally* relied on different history to adopt a counter-textual reading of a similar provision.

### B

Loughrin also appeals to principles of federalism to support his proffered construction. Unless we read §1344(2) as requiring intent to defraud a bank, Loughrin contends, the provision will extend to every fraud, no

matter how prosaic, happening to involve payment with a check—even when that check is perfectly valid. Consider, for example, a garden-variety con: A fraudster sells something to a customer, misrepresenting its value. There are countless variations, but let's say the fraudster passes off a cheap knock-off as a Louis Vuitton handbag. The victim pays for the bag with a good check, which the criminal cashes. Voila!, Loughrin says, bank fraud has just happened—unless we adopt his narrowing construction. After all, the criminal has intended to "obtain . . . property . . . under the custody or control of" the bank (the money in the victim's checking account), and has made "false or fraudulent . . . representations" (the lies to the victim about the handbag).[5] But if the bank fraud statute were to encompass all such schemes, Loughrin continues, it would interfere with matters "squarely within the traditional criminal jurisdiction of the state courts." Brief for Petitioner 29. We should avoid such a "sweeping expansion of federal criminal" law, he concludes, by reading §1344(2), just like §1344(1), as requiring intent to defraud a bank. Reply Brief 3 (quoting *Cleveland* v. *United States*, 531 U. S. 12, 24 (2000)).

We agree with this much of what Loughrin argues: Unless the text requires us to do so, we should not construe §1344(2) as a plenary ban on fraud, contingent only on use of a check (rather than cash). As we have often (and recently) repeated, "we will not be quick to assume

—————

[5] One might think the Federal Government would never use the bank fraud statute to prosecute such ordinary frauds just because they happen to involve payment by check rather than cash. But in fact, the Government has brought a number of cases alleging violations of §1344(2) on that theory (so far, it appears, unsuccessfully). See, *e.g., Thomas*, 315 F. 3d 190 (a home health care worker got a valid check from a patient to buy groceries, but then cashed the check and pocketed the money); *United States* v. *Rodriguez*, 140 F. 3d 163 (CA2 1998) (an employee filed fake invoices with her employer, causing the company to issue valid checks to her friend for services never rendered).

that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction." *Bond* v. *United States*, 572 U. S. ___, ___ (2014) (slip op., at 13) (quoting *United States* v. *Bass*, 404 U. S. 336, 349 (1971)); see *Cleveland*, 531 U. S., at 24 ("We resist the Government's reading . . . because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress"); *Jones* v. *United States*, 529 U. S. 848, 858 (2000) (similar). Just such a rebalancing of criminal jurisdiction would follow from interpreting §1344(2) to cover every pedestrian swindle happening to involve payment by check, but in no other way affecting financial institutions. Indeed, even the Government expresses some mild discomfort with "federalizing frauds that are only tangentially related to the banking system." Brief for United States 41.

But in claiming that we must therefore recognize an invisible element, Loughrin fails to take account of a significant *textual* limitation on §1344(2)'s reach. Under that clause, it is not enough that a fraudster scheme to obtain money from a bank and that he make a false statement. The provision as well includes a relational component: The criminal must acquire (or attempt to acquire) bank property "by means of" the misrepresentation. That phrase typically indicates that the given result (the "end") is achieved, at least in part, *through* the specified action, instrument, or method (the "means"), such that the connection between the two is something more than oblique, indirect, and incidental. See, *e.g.*, Webster's Third New International Dictionary 1399 (2002) (defining "by means of" as "through the instrumentality of: by the use of as a means"); 9 Oxford English Dictionary 516 (2d ed. 1989) (defining "means" as "[a]n instrument, agency, method, or course of action, by the employment of which some object is or may be attained, or which is concerned in bringing about some result"). In other words, not every

but-for cause will do. If, to pick an example out of a hat, Jane traded in her car for money to take a bike trip cross-country, no one would say she "crossed the Rockies by means of a car," even though her sale of the car somehow figured in the trip she took. The relation between those things would be (as the Government puts it) too "tangential[ ]" to make use of the phrase at all appropriate. Brief for United States 41.

Section 1344(2)'s "by means of" language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control. That occurs, most clearly, when a defendant makes a misrepresentation to the bank itself—say, when he attempts to cash, at the teller's window, a forged or altered check. In that event, the defendant seeks to obtain bank property by means of presenting the forgery directly to a bank employee. But no less is the counterfeit check the "means" of obtaining bank funds when a defendant like Loughrin offers it as payment to a third party like Target.[6] After all, a merchant accepts a check only to pass it along to a bank for payment; and upon receipt from the merchant, that check triggers the disbursement of bank funds just as if presented by the fraudster himself. So in either case, the forged or altered check—*i.e.*, the false statement— serves in the ordinary course as the means (or to use other words, the mechanism or instrumentality) of obtaining bank property. To be sure, a merchant might detect the

––––––––––

[6]The Government in such a case may, of course, face the separate claim that the defendant did not intend to obtain bank property at all: As noted earlier, Loughrin argued this point to the jury, contending (unsuccessfully) that he merely wanted to get cash from Target. See n. 3, *supra.* All we say here, for the reasons next stated, is that when the defendant has the requisite intent to acquire bank property, his presentation of a forged or altered check to a third party satisfies §1344(2)'s "means" requirement.

fraud (as Target sometimes did) and decline to submit the forged or altered check to the bank. But that is to say only that the defendant's scheme to obtain bank property by means of a false statement may not succeed. And we have long made clear that such failure is irrelevant in a bank fraud case, because §1344 punishes not "completed frauds," but instead fraudulent "scheme[s]." *Neder*, 527 U. S., at 25.

By contrast, the cases Loughrin hopes will unnerve us—exemplified by the handbag swindle—do not satisfy §1344(2)'s "means" requirement.[7] Recall that in such a case the check is perfectly valid; so the check itself is not (as it was here) a false or fraudulent means of obtaining bank money. And the false pretense that has led, say, the handbag buyer to give a check to the fraudster has nothing to do with the bank that will cash it: No one would dream of passing on to the bank (as Target would forward a forged check) the lie that a knock-off is a Louis Vuitton. The bank's involvement in the scheme is, indeed, wholly fortuitous—a function of the victim's paying the fraudster by (valid) check rather than cash. Of course, the bank would not have disbursed funds had the misrepresentation never occurred, and in that sense, the lie counts as a but-for cause of the bank's payment. But as we have said, §1344(2)'s "by means of" language requires more, see *supra,* at 11–12: It demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money. And in cases like the handbag swindle, where no false statement will ever go to a financial institution, the fraud is not the means of obtaining bank property.[8]

––––––––––

[7] Even the Government, we note, acknowledges that §1344(2) is reasonably read to exclude such cases from its coverage. See Brief for United States 40–44; Tr. of Oral Arg. 43–47.

[8] JUSTICE SCALIA takes issue with our limitation of §1344(2), contending first that the fraudster's "indifferen[ce] to the victim's method of

The premise of Loughrin's federalism argument thus collapses. He claims that we must import an unstated element into §1344(2) to avoid covering run-of-the-mill frauds, properly of concern only to States. But in fact, the text of §1344(2) already limits its scope to deceptions that have some real connection to a federally insured bank, and thus implicate the pertinent federal interest. See S. Rep. No. 98–225, at 378 (noting that federal "jurisdiction is based on the fact that the victim of the offense is a federally

—————

payment" does not "cause what is a means not to be a means." *Post*, at 2–3 (opinion concurring in part and concurring in judgment) (emphasis deleted). To illustrate the point, he offers an example: Someone "obtain[s] 7-Eleven coffee by means of [his] two dollars" even if he went to 7-Eleven rather than Sheetz only because it happened to be the closest. *Post,* at 3. But that objection is based on a misunderstanding of our opinion. The "by means of" phrase calls for an inquiry into the directness of the relationship between means and ends, not the fraudster's subjective intent. (We take it JUSTICE SCALIA agrees; he recognizes that "not every but-for cause of an act is a cause 'by means of' which the act has occurred." *Post*, at 2.) And we concur with the bottom line of JUSTICE SCALIA's example: There, the means (the two dollars) is the thing that achieves the specified end (getting the cup of 7-Eleven coffee). By contrast, for the reasons elaborated above, the misstatement in our handbag hypothetical is not the mechanism by which the fraudster obtains *bank* property, given that the lie will never reach the bank.

And so JUSTICE SCALIA tries another example, this one (involving Little Bobby) contesting our view of directness. *Post*, at 3–4. But such hypotheticals mostly show that what relationships count as close enough to satisfy the phrase "by means of" will depend almost entirely on context. (We might counter with some examples of our own, but we fear that would take us down an endless rabbit hole.) Language like "by means of" is inherently elastic: It does not mean one thing as to all fact patterns—and certainly not in all statutes, given differences in context and purpose. All we say here is that the phrase, as used in §1344(2), is best read, for the federalism-related reasons we have given, see *supra,* at 9–11, as drawing a line at frauds that have some real connection to a federally insured bank—namely, frauds in which a false statement will naturally reach such a bank (or a custodian of the bank's property).

controlled or insured institution"). And Loughrin's own crime, as we have explained, is one such scheme, because he made false statements, in the form of forged and altered checks, that a merchant would, in the ordinary course of business, forward to a bank for payment. See *supra,* at 12–13. We therefore reject Loughrin's reading of §1344(2) and his challenge to his conviction.[9]

For the reasons stated, we affirm the judgment of the Tenth Circuit.

*It is so ordered.*

——————

[9] As a last-gasp argument, Loughrin briefly asserts that §1344(2) at least requires the Government to prove that the defendant's scheme created a risk of financial loss to the bank. See Brief for Petitioner 36–40. But once again, nothing like that element appears in the clause's text. Indeed, the broad language in §1344(2) describing the property at issue—"property owned by or under the custody or control of" a bank—appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud. See *United States* v. *Nkansah*, 699 F. 3d 743, 754 (CA2 2012) (Lynch, J., concurring in part and concurring in judgment in part). And Loughrin's argument fits poorly with our prior holding that the gravamen of §1344 is the "scheme," rather than "the completed fraud," and that the offense therefore does not require "damage" or "reliance." *Neder* v. *United States*, 527 U. S. 1, 25 (1999); see *supra,* at 13.

# SUPREME COURT OF THE UNITED STATES

No. 13–316

KEVIN LOUGHRIN, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 23, 2014]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in part and concurring in the judgment.

I join Parts I and II of the Court's opinion, Part III–A except the last paragraph, and the last footnote in Part III–B. I do not join the remainder of Part III–B.

I agree with the Court that neither intent to defraud a bank nor exposure of a bank to a risk of loss is an element of the crime codified in 18 U. S. C. §1344(2). But I am *dubitante* on the point that one obtains bank property "by means of" a fraudulent statement only if that statement is "the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control," *ante,* at 12. The Government suggested that test, but only briefly claimed it was to be found in the "by means of" language, Brief for United States 40–41—so briefly that Loughrin responded that "[t]he Government does not claim any textual basis for this [naturally inducing] rule," Reply Brief 13. We have heard scant argument (nothing but the Government's bare-bones assertion) in favor of the "by means of" textual limitation, and no adversary presentation whatever opposing it. The Court's opinion raises the subject in order to reply to Loughrin's argument that, unless we adopt his proposed nontextual limitations, all frauds effected by receipt of a check will become federal crimes. It seems to me enough to say that Loughrin's solutions to the problem of the statute's sweep are, for the

reasons well explained by the Court's opinion, not correct. What the proper solution may be should in my view be left for another day. I discuss below my difficulties with the "by means of" solution.

Recall the Court's hypothetical garden-variety con. "A fraudster [makes a statement] pass[ing] off a cheap knock-off as a Louis Vuitton handbag. The victim pays for the bag with a good check, which the criminal cashes." *Ante,* at 10. The fraudster unquestionably has obtained bank property. But how? By presenting the check to a bank teller, yes. But also by duping the buyer. Yet according to the Court, the fraudster's deceit was not a "means" of obtaining the cash, because tricking a buyer into swapping a check for a counterfeit carryall is not a "mechanism naturally inducing a bank . . . to part with money in its control." *Ante*, at 12. The bank's involvement, it says, is mere happenstance.

I do not know where the Court's crabbed definition of "means" comes from. Certainly not the dictionary entries that it quotes. Quite the contrary, those suggest that the handbag fraudster's deceitful statement *was* a "means": Undoubtedly, the trickery was a "'method, or course of action, by the employment of which [bank property was] attained.'" *Ante*, at 11. Though the dictionaries do not appear to add that the connection between "means" and end must be "something more than oblique, indirect, and incidental," *ibid.*, I agree that, in common usage, not every but-for cause of an act is a cause "by means of" which the act has occurred. No one would say, for example, that the handbag fraudster obtained bank property by means of his ancestors' emigration to the United States. But all *would* say, I think, that he obtained the property by means of the lie. His deceit is far from merely incidental to, or an oblique or indirect way of, obtaining the money. That was the lie's very purpose.

That the fraudster likely was *indifferent* to the victim's

method of payment—making his receipt of *bank* money instead of straight cash merely "fortuitous," *ante*, at 13— does not suggest, in ordinary parlance, that the fraud was not a means of acquiring bank property. Indeed, saying that indifference is disqualifying comes close to requiring the intent to defraud a bank that the Court properly rejects. In any case, indifference certainly does not cause what is a means not to be a means. Suppose I resolve to purchase (with the two dollars in my billfold) a coffee at the first convenience store I pass on my way to work. I am indifferent to what store that might be. I catch sight of a 7-Eleven, pull in, and, with my cash, buy the drink. That it is a 7-Eleven coffee rather than a Sheetz coffee is "wholly fortuitous," *ibid*. Still, no one would say that I had not obtained 7-Eleven coffee *by means of* my two dollars. So too with the handbag swindler: Regardless of whether the cash is the victim's or, technically, the bank's, and regardless of whether the swindler cared which it was, would we not say that the fraudster has obtained it by means of the trick?

The majority responds that the measure of "means" is not indifference or the absence of fortuity but rather *directness*. And not just proximate-cause-like directness— the fraudulent statement literally must "reach the bank," *ante*, at 14, n. 8. Once again, it seems to me the Court's definition does not accord with common usage. Suppose little Bobby falsely tells his mother that he got an A on his weekly spelling test and so deserves an extra cookie after dinner. Mother will not be home for dinner, but she leaves a note for Father: "Bobby gets an extra cookie after dinner tonight." (Much like the handbag buyer's note to the bank: "Pay $2,000 to the order of Mr. Handbag Fraudster.") Dinner wraps up, and Bobby gets his second cookie. Has he obtained it by means of the fib to his mother? Plainly yes, an ordinary English speaker would say. But plainly *no* under the Court's definition, since the lie did

not make its way to the father.

The Court's chief illustration of its "by means of" gloss seems to me contrived. If "Jane traded in her car for money to take a bike trip cross-country, no one would say she 'crossed the Rockies by means of a car.'" *Ante*, at 12. Of course. By using two vehicles of conveyance, and describing the end in question as "crossing the Rockies," the statement that the car was the "means" of achieving that end invites one to think that Jane traveled by automobile. But the proper question—the one parallel to the question whether the fraudster obtained bank funds by means of fraudulently selling the counterfeit—is not whether Jane crossed the Rockies by means of the car, but whether she funded her trip by means of selling the car. Which she assuredly did. Just as the handbag swindler, in the Louis Vuitton example, obtained money by means of his false representation.

I certainly agree that this statute must be interpreted, if possible, in a manner that will not make every fraud effected by receipt of a check a federal offense. But deciding this case does not require us to identify that manner, and I would leave that for another case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–316

_____

## KEVIN LOUGHRIN, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 23, 2014]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I agree with the Court's holding that 18 U. S. C. §1344(2) requires neither intent to defraud a bank nor the creation of a risk of financial loss to a bank, but I must write separately to express disagreement with some dicta in the opinion of the Court.

In a few passages, the Court suggests that §1344(2) requires a *mens rea* of purpose. See *ante,* at 4 ("[T]he clause requires that the defendant intend 'to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution'" (ellipsis in original)); *ante,* at 12, n. 6 ("[W]hen the defendant has the requisite intent to acquire bank property, his presentation of a forged or altered check to a third party satisfies §1344(2)'s 'means' requirement").\* That is incorrect.

Congress expressly denoted the *mens rea* a defendant must have to violate §1344(2), and it is not purpose. Instead, §1344(2) imposes liability on "[w]hoever *knowingly* executes, or attempts to execute, a scheme or artifice" to obtain bank property. (Emphasis added.) It is hard to imagine how Congress could have been clearer as to the mental state required for liability.

———————

\*Cf. *ante,* at 5 (§1344(1) "includes the requirement that a defendant intend to 'defraud a financial institution' ").

The Court's contrary statements apparently derive from the fact that the criminal venture that a defendant must knowingly execute or attempt to execute must be a scheme or artifice "to obtain . . . property owned by . . . a financial institution." §1344(2). A defendant must have the purpose to obtain bank property, so the argument goes, because he must execute a scheme the purpose of which is to obtain bank property.

This argument confuses the design of the scheme with the *mens rea* of the defendant. The statute requires only that the objective of the *scheme* must be the obtaining of bank property, not that the *defendant* must have such an objective. Of course, in many cases a scheme's objective will be the same as an individual defendant's. Where the defendant acts alone, for instance, his objective will almost certainly be the same as that of the scheme, and the inquiry into the defendant's *mens rea* and the scheme's objective will accordingly merge. But in some cases, such as those involving large, complex criminal ventures, a given defendant's purpose may diverge from the scheme's objective. For instance, a defendant who is paid by a large ring of check forgers to present one of their forged checks to a bank for payment has executed "a scheme or artifice . . . to obtain" bank property, even if he only presents the check because he is paid to do so and personally does not care whether the forged check is honored. That is because the objective of the scheme as a whole is to obtain bank property, and the defendant knowingly executes that scheme.

The majority reads the word "knowingly" out of the statute. That term "'requires proof of knowledge of the facts that constitute the offense.'" *Dixon* v. *United States*, 548 U. S. 1, 5 (2006). If the majority is correct that the language "a scheme or artifice . . . to obtain" bank property demands that the defendant intend to obtain bank property, then the word "knowingly" is superfluous, because a

defendant whose purpose is to obtain bank property will always know that his purpose is to obtain bank property. Why would Congress expressly specify a lesser *mens rea* element if elsewhere in the statute it commands a greater, subsuming one?

Proof that a defendant acted knowingly very often gives rise to a reasonable inference that the defendant also acted purposely, and therefore the Court's dicta may not have much practical effect. But if the issue is presented in a future case, the Court's statements must be regarded as dicta. The Court's statements that a defendant must intend to obtain bank property to be convicted under §1344(2) are unnecessary to its conclusion that a defendant may be convicted under this provision without proof that he either intended to defraud a bank or created a risk of loss to a bank. Furthermore, as the Court makes clear, petitioner waived any challenge to his conviction arising from an asserted statutory requirement that he must have intended to obtain bank property. See *ante,* at 4, n. 3.